IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) SONIC INDUSTRIES LLC,<br>a Delaware limited liability company, and<br>(2) SONIC FRANCHISING LLC,<br>a Delaware limited liability company,<br><br>            Plaintiffs<br>v.<br><br>(1) LET'S SHAKE, L.L.C.,<br>a Texas limited liability company,<br>(2) SUNIL DHAROD, individually, and<br>(3) LET'S SHAKE ON IT, L.L.C.,<br>a Texas limited liability company,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. CIV-24-474-HE<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Defendants Let's Shake, L.L.C., Sunil Dharod, and Let's Shake on It, L.L.C. (collectively "Defendants"), pursuant to Fed. R. Civ. P. 56 and LCvR 56.1, submit this Response to Plaintiffs' Motion for Summary Judgment and state the following:

**I. INTRODUCTION**

Let's Shake and Sonic Franchising entered into an Acquisition Agreement dated October 18, 2016 (the "Acquisition Agreement"), which preceded their entering into that certain Development Agreement dated November 3, 2016 (the "Development Agreement"). Pursuant to the terms of the Development Agreement, Sonic granted Let's Shake exclusive rights to develop Sonic drive-in restaurant franchises within the defined sales territory of Bexar County, Texas. By an Amendment to the License Agreements (the "Amendment"), Sonic and Let's Shake also agreed to accept an assignment of numerous

License Agreements in its capacity as a Co-Licensee of and with Sonic (the "License Agreements" and collectively with the Development Agreement and the Amendment, the "Agreements"), granting to Let's Shake certain licensing and other rights associated with owning and operating Sonic drive-in restaurants, including the right to limit Sonic from franchising to third parties within a defined radius around each Sonic drive-in restaurant owned and operated by Let's Shake. Each License Agreement contains a "Trade Radius" clause substantially identical to the following provision:

> 2.02   <u>Trade Radius</u>.  Subject to the provisions of Sections 2.02(c) and 2.02(d) below, Sonic shall not own or operate a Sonic drive-in restaurant and shall not license any other Person to own or operate a Sonic drive-in restaurant (other than a Sonic drive-in restaurant licensed prior to the date of this Agreement) within the Protected Area, which is the area determined as of the date of this Agreement by the following provisions:
>
> (a)   (i)   An area defined by a radius extending one and one-half miles from the front door of the Sonic Restaurant if located within a city, town, or MSA having a population of 75,000 or more.
>
> (ii)   An area defined by a radius extending two miles from the front door of the Sonic Restaurant if located within a city, town, or MSA having a population of less than 75,000 but more than 25,000.
>
> (iii)   An area defined by a radius extending three miles from the front door of the Sonic Restaurant if located within a city, town, or MSA having a population of 25,000 or less.
>
> (iv)   An area defined by a radius extending three miles from the front door of the Sonic Restaurant if located outside a city, town, or MSA.
>
> (b)   The Protected Area shall extend into: (i) the contractually-granted protected radius of any Sonic drive-in restaurant in existence as of the date of this Agreement

> ("Previously Protected Radius") and (ii) the protected area of any developer under an area development agreement with Sonic in existence as of the date of this Agreement ("Previously Protected Development Area"). Consequently, any Previously Protected Radius and any Previously Protected Development Area shall be excepted from the Protected Area. Sonic shall determine the population of an MSA from time to time after the date of this Agreement according to the latest published federal census (or other data selected by Sonic) and may reduce the Protected Area accordingly upon notice to the Licensee. If more than one subpart of Section 2.02(a) applies, then only the subpart with the smallest area shall apply.

See Exhibit 4 to Plaintiffs' Motion for Summary Judgment.

On May 9, 2024, Sonic initiated the present lawsuit against the Defendants, asserting claims relating to Let's Shake's performance of various agreements, which incorporate the Agreements (Dkt. #1). Sonic alleges that Let's Shake has failed to make certain royalty and brand fee payments contemplated under the Agreements relating to Let's Shake's ownership and operation of Sonic drive-in restaurants in various locations in Texas. Dharod and Shake on It were guarantors of Let's Shake's performance of the Agreements, and so were named as co-defendants.

In response to this suit, Let's Shake has alleged that Sonic has breached each of the Agreements by licensing third parties to own and operate Sonic drive-in restaurants within the sales territory previously dedicated exclusively to Let's Shake. This breach led to a severe diminution in sales and value to a number of the restaurants owned and operated by Let's Shake. Additionally, unforeseen circumstances resulting from the emergence of, and response to, the Covid-19 pandemic made performance under the Agreements impracticable.

## II. RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants do not dispute the facts asserted in Nos. 1-8, 38, 52, and 54 of Plaintiffs' Statement of Undisputed Material Facts. Defendants dispute that the amounts claimed to be owed are correct as alleged in Nos. 9-37, 39-51, and 53.

## III. ADDITIONAL MATERIAL FACTS THAT PRECLUDE SUMMARY JUDGMENT

1. One of the key elements of the Sonic license agreement is defined at § 1.09: "Protected Area. The phrase "Protected Area" shall mean the area defined by Sections 2.02 and 2.03 of this Agreement." (Doc. 39-5, p. 5.) Under the agreement the licensee is given an exclusive right to adopt and use the Sonic System for a Sonic drive-in restaurant, according to the terms of the license agreement. (Doc. 39-5, p. 6, § 2.01). Under § 2.02, Plaintiffs are forbidden to "own or operate a Sonic drive-in restaurant and shall not franchise any other Person to own or operate a Sonic drive-in restaurant (other than a Sonic drive-in restaurant licensed prior to the date of this Agreement) within the area [defined]." (Doc. 39-5, p. 6.) Moreover, § 2.03, which is titled "Efficient Market Development and Sales Dilution," contains provisions requiring Plaintiffs to use "best efforts to reduce the dilution of sales and profitability" even in circumstances where a competing restaurant may be properly located nearby. (Doc. 39-5 pp. 6-7.) These obligations appear in other of the agreements at issue. See Doc. 39-4 pp. 5-8; Doc. 39-6 pp. 5-7); Doc. 39-7 pp. 5-8; and Doc. 39-8, pp. 11-13; Doc. 39-9. Plaintiffs' conduct is in breach of these obligations, creating a question of material fact as to whether they first breached the contract. See generally, Declaration of Anthony Carrick, Ex. 1.

2. In 2016, Defendant, Sunil Dharod, was approved as a Licensee of Sonic Industries. As part of Sonic's then efforts to reposition its corporate stores owned and operated by Sonic Restaurants, Inc. ("SRI"), Sonic recruited a number of new Licensees to acquire corporate stores in various markets. Carrick Declaration, ¶ 4.

3. As part of the rebranding of corporate owned stores to become Licensee stores, Let's Shake was formed by affiliates owned and controlled by Sunil Dharod and SRI to acquire and operate 54 Sonic Drive-In Restaurants located within the San Antonio, Texas designated market area, or DMA. The transaction closed effective November 3, 2016. Carrick Declaration, ¶ 5.

4. At the time of the transaction, there were a number of underperforming stores within the Portfolio acquired by Let's Shake. This reality resulted in store closures within months of the closing and continuing thereafter through 2024. A list of the closures to date within the Portfolio is attached to the Carrick Declaration. Carrick Declaration, ¶ 6.

5. As a condition to the acquisition of the stores by Let's Shake, Let's Shake was required to enter into an Area Development Agreement committing to the development of at least five (5) additional stores within the San Antonio DMA. Declaration of Kerry Assa, Exhibit 2 ¶ 4. Unknown to Let's Shake at the time was the reality that Sonic had already entered into an Area Development Agreement ("ADA") with another Sonic Licensee to develop an additional ten (10) plus stores also within the San Antonio DMA and within the same relative timeframe. This ADA with the other Licensee reserved ten (10) points or key intersections within the San Antonio DMA exclusively to the other Licensee. Carrick Declaration, ¶ 7. Sonic declined repeated requests both pre and post-

acquisition to inform Let's Shake regarding the location of the development points previously assigned to other Licensees under ADA's. Carrick Declaration, ¶ 9.

6. This reality resulted in an already overbuilt market being committed to become further overbuilt and diluted. Carrick Declaration, ¶ 8; Assa Declaration, ¶ 10.

7. In 2020, as a result of the worldwide pandemic due to COVID-19 (the "Pandemic"), the mandates of the World Health Organization, the President of the United States, and the Governor of the State of Texas, restaurants in Texas were restricted to drive-thru and carryout only. Carrick Declaration, ¶ 10.

8. The result of the Pandemic and the related Pandemic Orders was to position the Sonic Brand as uniquely situated to be able to respond to the Pandemic. This resulted in a significant increase in revenue for the calendar years 2020 and 2021. However, this dramatic increase in revenues during the Pandemic disguised the challenges the Let's Shake Portfolio was still experiencing due to underperforming stores that were draining cash flow at a disproportionate level. Carrick Declaration, ¶ 11.

9. Following the Pandemic, Let's Shake experienced an unforeseen trifecta of circumstances beyond its control by virtue of the (i) normalization of revenues when the Pandemic was declared to have ended and dine-in restrictions were lifted, (ii) inflation driven by supply chain issues which occurred during the Pandemic and continued thereafter, creating an unusual increase in costs of goods, and (iii) the challenges of the labor force due to the reluctance or unwillingness to return to work once the Pandemic was declared to have ended. Carrick Declaration, ¶ 12.

10. The net result of these unforeseeable factors beyond the control of Let's Shake was a precipitous drop in revenues between 2021 and 2022 in excess of approximately $10 million or approximately 18% of Let's Shake's gross revenues. Additionally, Sonic's market share began to decrease system-wide with the end of the Pandemic. Carrick Declaration, ¶ 13. This was the direct result of Plaintiffs failing to perform their obligations under the Agreement leading to a disastrous impact by these Post-Pandemic events. Carrick Declaration, ¶'s 14-16; Assa Declaration ¶ 6, 10.

11. These factors coupled with Sonic's refusal to permit additional store closures on historically underperforming stores and unwillingness to approve development opportunities within the San Antonio DMA due to potential adverse impact on other franchisees, all combined to prevent Let's Shake from performing its obligations with regard to payment of royalties and other Sonic mandated fees. Carrick Declaration, ¶ 14.

12. These factors futher resulted in a severe decrease in operational cash flow to the point that SSCP Management that was providing general and administrative services to Let's Shake for a fee, deferred its management fees of approximately $1 million a year. That deferment continues today. Carrick Declaration, ¶ 15.

13. As part of its ongoing efforts to resolve the operational challenges of Let's Shake, Let's Shake on several occasions asked Sonic to sanction the closing of nine (9) of its grossly underperforming stores within the Portfolio despite its efforts to try to improve the sales at those locations. Sonic repeatedly denied Let's Shake this opportunity. This resulted in a further dilution of operational cash flow and exacerbated Let's Shake's inability to pay royalties and fees as revenues from the stores that were otherwise capable

of meeting its obligations under the various License Agreements was needed to support the operational costs of the nine (9) stores that were underperforming. Let's Shake's ability to counter the post-Pandemic adversity was minimized, if not precluded by the direct impacts from the development of other units by other Licensees within the San Antonio DMA. Carrick Declaration, ¶ 16; Assa Declaration, ¶ 11.

14. Recently, Sonic has permitted the closure of three (3) additional units for which leases were expiring, but the permissions were too little, too late, and the Portfolio continues to suffer due to additional underperforming stores and Sonic's continuing systemwide dilution of market share. Carrick Declaration, ¶ 17.

15. Plaintiffs breached the Agreement by failing to cooperate with Let's Shake to locate and open profitable locations so that it could take full advantage of the Agreement. Subsequent to the execution of the ADA, there were considerable efforts made by Let's Shake to locate potential sites for development of additional Sonic Drive-In Restaurants but, each time that a site was submitted, Sonic declined to approve those sites based upon perceived adverse impact on other licensees' locations or because the location had already been contractually reserved for other Sonic licensees within the San Antonio DMA. Assa Declaration, ¶ 5.

16. Despite Let's Shake's efforts, including the acquisition of real estate with the intent of developing Sonic Restaurants, Sonic repeatedly declined to approve any sites proposed by Let's Shake for development. Assa Declaration, ¶ 6. In one instance, Sonic refused to allow a Sonic Drive-In to be developed in the development area known as The Rim because the area had previously been committed contractually to another licensee.

While the other San Antonio area licensee was permitted to develop a new store in proximity to The Rim, the entire area was precluded from additional development by Sonic as opposed to simply the radius that would ordinarily apply under the license agreement for that site (1.5 miles). The result was continued preclusion of Let's Shake's development efforts to comply with the ADA. Assa Declaration, ¶ 7. Sometime later a site was finally approved but, by that time, the Pandemic had ensued and efforts to develop additional restaurants was less of a priority than addressing the challenges of the Pandemic and the fallout therefrom. Assa Declaration, ¶ 8. Similarly, Let's Shake tried to get approval for a site within the Alamo Ranch Development but were advised that the site would not be approved due to the competing ADA. Assa Declaration, ¶ 9.

## IV. ARGUMENT

1. **Standard of Review**

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party has the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts

are to be determined in a light most favorable to the non-movant. *United States v. Agri Services, Inc.*, 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983).

2. **Genuine Issues of Material Fact Remain Precluding Summary Judgment**[1]

    A. **Plaintiffs' are not entitled to summary judgment because there are disputed material facts about the defense of first breach.**

   Oklahoma recognizes the "first breach" defense which establishes that a party who is first to violate a contract's terms may not enjoy its benefits by claiming breach against the other party.

   > Under well-established common law rules, a party in material breach of a contract cannot enforce or recover on the contract. *See Owens v. Automotive Engineers, Inc.*, 208 Okla. 251, 255 P.2d 240, 247 (Okla.1953); *Camp v. Black Gold Petroleum Co.*, 195 Okla. 30, 154 P.2d 769, 771 (Okla.1944); *Messick v. Johnson*, 167 Okla. 463, 30 P.2d 176, 178 (Okla.1934); *Robberson Steel Co. v. Harrell*, 177 F.2d 12, 17 (10th Cir.1949); 17B C.J.S. Contracts § 503 (1999); Restatement (Second) of Contracts § 237 (1981.)

   *Dollar Rent A Car Sys., Inc. v. P.R.P. Enters., Inc.*, No. 01 CV 698 JHP FHM, 2006 WL 1266515, at *23 (N.D. Okla. May 8, 2006), aff'd, 242 F. App'x 584 (10th Cir. 2007). Ultimately decided based on the principle that "a party to a contract cannot claim its benefits where he is the first to violate its terms." See also *Western Plains Serv. Corp. v.*

---

[1] The Court's Order of April 10, 2025, on Defendants' Motion to Compel Arbitration (Doc. 16) does not obviate the Defendants' ability to support its affirmative defenses and/or offsets to liability with respect to Plaintiffs' claims for relief.

*Ponderosa Dev. Corp.*, 769 F.2d 654, 657 (10th Cir.1985) ("The law is well settled that a party to a contract cannot claim its benefits where he is the first to violate its terms.")

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this case, there are material facts about whether Plaintiffs performed or whether they were the first to materially breach. "What constitutes a material breach is a question of fact." *Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*, 117 F. App'x 6, 11 (10th Cir. 2004).

When material facts exist as to the validity of an affirmative defense, summary judgment in favor of a plaintiff is precluded. *Spencer v. Individual Assurance Co., Life, Health & Accident*, No. CIV-09-090-KEW, 2010 WL 11579475, at *3 (E.D. Okla. Apr. 15, 2010) ("Disputes in the facts material to the breach of contract claim and rescission defense asserted in this case precludes summary judgment for IAC."); *Bird v. Coleman*, 1997 OK 44, ¶ 21, 939 P.2d 1123, 1127, as amended (Apr. 15, 1997) ("The material facts surrounding the terms of the contract, Coleman's affirmative defenses to Birds' claims and Coleman's entire counterclaim were in sharp dispute. Accordingly, we hold that summary judgment was premature and improperly granted to the Birds on their claim for recovery against Coleman.")

The facts in this matter establish that Plaintiffs failed to fulfill their obligations under the Agreements.

One of the key elements of the Sonic license agreement is defined at § 1.09: "Protected Area. The phrase "Protected Area" shall mean the area defined by Sections 2.02 and 2.03 of this Agreement." (Doc. 39-5, p. 5.) Under the agreement the licensee is given

an exclusive right to adopt and use the Sonic System for a Sonic drive-in restaurant, according to the terms of the license agreement. (Doc. 39-5, p. 6, § 2.01). Under § 2.02, Plaintiffs are forbidden to "own or operate a Sonic drive-in restaurant and shall not franchise any other Person to own or operate a Sonic drive-in restaurant (other than a Sonic drive-in restaurant licensed prior to the date of this Agreement) within the area [defined]." (Doc. 39-5, p. 6.) Moreover, § 2.03, which is titled "Efficient Market Development and Sales Dilution," contains provisions requiring Plaintiffs to use "best efforts to reduce the dilution of sales and profitability" even in circumstances where a competing restaurant may be properly located nearby. (Doc. 39-5 pp. 6-7.) These obligations also appear in other of the agreements at issue. See Doc. 39-4 pp. 5-8; Doc. 39-6 pp. 5-7); Doc. 39-7 pp. 5-8; and Doc. 39-8, pp. 11-13; Doc. 39-9. As an agreement governed by Oklahoma law, these provisions take on another dimension because "every contract in Oklahoma contains an implied duty of good faith and fair dealing." *Gens v. Casady Sch.*, 2008 OK 5, ¶ 11, 177 P.3d 565, 570. Plaintiffs' performance must be measured by these contractual provisions with an added component that they must act in good faith and with fair dealing in protecting and promoting the Protected Area. That, of course, is a key component of value in a franchise. These provisions result in the protected franchisee having the ability to develop the most promising locations in the area.

    The Declarations of witnesses Carrick and Assa demonstrate that there are fact issues that remain to be decided as to whether Plaintiffs breached the Agreement's express terms and the obligation of good faith. If they did, then Oklahoma law provides a defense of first breach which limits or eliminates their ability to prevail on a claim of breach.

## B. **Plaintiffs' are not entitled to summary judgment because there are disputed material facts related to the defense of impracticability.**

Impossibility or impracticability (or frustration of purpose) has been broadly recognized as a defense to contractual performance. Oklahoma law recognizes the defense of commercial impracticability. Oklahoma Uniform Jury Instruction 23.37 states that a party is relieved from the duty to perform under a contract if:

1) The cost of performing it has become totally unreasonable or impracticable because of an occurrence that was beyond the control of the parties; and

2) Neither of the parties could reasonably foresee the occurrence when they made the contract.

Further, the Comments to OUJI 23.37 cite favorably to Restatement (Second) of Contracts § 261 comment d (1979), which states in part (with emphasis added):

> Performance may be impracticable because extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved. A severe shortage of raw materials or of supplies due to war, embargo, local crop failure, unforeseen shutdown of major sources of supply, or the like, which either causes a marked increase in cost or prevents performance altogether may bring the case within the rule stated in this Section.

The Oklahoma Supreme Court has held that "impossibility 'means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved'." *Meng v. Rahimi*, 2022 OK 11, ¶ 12, 505 P.3d 926, 929 (*quoting Kansas, Oklahoma & Gulf. Ry. Co. v. Grand Lake Grain Co.*, 1967 OK 170, ¶ 21, 434 P.2d 153, 158).

Defendants have presented disputed facts meeting the requirements for the defense of commercial impracticability. Unforeseeable events beyond the control of the parties caused the cost of performing under the Agreements to become totally unreasonable. At a

minimum, Defendants should be allowed to present evidence regarding commercial impracticability to the trier of fact. *Meng v. Rahimi*, 2022 OK 11, 505 P.3d 926 (It was error to not allow the Defendant to present evidence for the defense of impracticability resulting from the Covid-19 pandemic). The question of whether unforeseen circumstances made performance commercially impracticable should be answered by the trier of fact, and not through summary judgment.

## V. CONCLUSION

Plaintiffs have not met their burden of showing that no genuine issues of material fact exist regarding its claim to collect on the Agreements. Plaintiffs want this Court and Defendants to simply take it on their word that the alleged amounts are due under the Agreements before allowing the discovery process to play out. Defendants have raised genuine issues regarding the enforceability of the Agreements, and to short-circuit the fact-finding function of the Court at this preliminary stage would be unjust and contrary to well-established precedent. Sonic's Motion for Summary Judgment must fail.

WHEREFORE, Defendants respectfully request that the Court deny Plaintiffs' Motion for Summary Judgment, for the reasons detailed herein.

Respectfully submitted,

By:  /s/ D. Benham Kirk, OBA No. 5044
D. Benham Kirk, OBA No. 5044
Michael S. Linscott, OBA No. 17266
Todd L. Grimmett, OBA No. 21199
210 Park Avenue, Suite 1200
Oklahoma City, Oklahoma 73102-5603
dbkirk@dsda.com
mlinscott@dsda.com
tgrimmett@dsda.com
Phone: 405.319.3506
Phone: 918.591.5288
Phone: 405.898.8660
Fax: 405.319.3536
Fax: 918.925.5288
Fax: 405.898.8689
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that on Tuesday, December 30, 2025, I transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF Registrants:

JOE M. HAMPTON, OBA No. 11851
TOBY M. McKINSTRY, OBA No. 17401
MAGGIE M. LOGAN, OBA No. 3322
TOMLINSON MCKINSTRY, P.C.
Two Leadership Square
211 North Robinson Ave., Suite 450
Oklahoma City, OK 73102
Telephone: (405) 702-4346
Facsimile: (833) 657-0184
joeh@tmoklaw.com
tobym@tmoklaw.com
maggiel@tmoklaw.com

                                      /s/ D. Benham Kirk
                                      D. Benham Kirk